UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| FERNANDO GALLEGOS, | Case No. 3:15-cv-00254-RCJ-CLB |
| Petitioner, | ORDER |
| v. | |
| ISIDRO BACA, et al., | |
| Respondents. | |

Fernando Gallegos' third-amended 28 U.S.C. § 2254 petition for writ of habeas corpus is before the court for adjudication on the merits (ECF No. 42).

I.   **Background & Procedural History**

On November 22, 2008, a jury convicted Gallegos of first-degree murder for the stabbing death of a man in a Reno motel (exhibit 28).[1]  A separate penalty hearing was then held before the jury, and Gallegos was sentenced to life in prison without the possibility of parole.  Exh. 31.  Judgment of conviction was entered on March 11, 2009. Exh. 34.

The Nevada Supreme Court affirmed Gallegos' conviction on September 28, 2010.  Exh. 4. On April 15, 2015, the Nevada Court of Appeals affirmed the denial of Gallegos' state postconviction petition.  Exh. 8.  Remittitur issued on May 11, 2015. Exh. 56.

---

[1] Exhibits 1-8 are exhibits to petitioner's first-amended petition, ECF No. 11, and are found at ECF No. 12. Exhibits 9-57 are exhibits to petitioner's second-amended petition, ECF No. 23, and are found at ECF Nos. 24-26, 28.  Exhibits 58-169 are exhibits to respondents' first motion to dismiss, ECF No. 30, and are found at 31-34.

Gallegos dispatched his federal habeas petition for filing on or about May 10, 2015 (ECF No. 6).  This court appointed the Federal Public Defender as counsel for Gallegos.  Gallegos ultimately filed a counseled, third-amended petition on May 4, 2017 (ECF No. 42).  Respondents have now answered the remaining claims, and Gallegos has replied (ECF Nos. 69, 81).

II.     **Legal Standard—Antiterrorism and Effective Death Penalty Act (AEDPA)**

28 U.S.C. § 2254(d), a provision of the Antiterrorism and Effective Death Penalty Act (AEDPA), provides the legal standards for this court's consideration of the petition in this case:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693-694 (2002). This court's ability to grant a writ is limited to cases where "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating

state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell*, 535 U.S. at 694.

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 74 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir.2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

> .... [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

1
2
3

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir.2004); *see also Lambert*, 393 F.3d at 972.

4
5
6
7
8
9

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence. The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Cullen*, 563 U.S. at 181.  Finally, in conducting an AEDPA analysis, this court looks to the last reasoned state-court decision.  *Murray v. Schriro*, 745 F.3d 984, 996 (9th Cir. 2014).

10
11
12
13
14
15
16
17
18

A state prisoner is entitled to federal habeas relief only if he is being held in custody in violation of the constitution, laws or treaties of the United States.  28 U.S.C. § 2254(a).  Unless an issue of federal constitutional or statutory law is implicated by the facts presented, the claim is not cognizable under federal habeas corpus.  *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  A petitioner may not transform a state-law issue into a federal one merely by asserting a violation of due process.  *Langford v. Day*, 110 F.3d 1380, 1381 (9th Cir. 1996).  Alleged errors in the interpretation or application of state law do not warrant habeas relief.  *Hubbart v. Knapp*, 379 F.3d 773, 779-80 (9th Cir. 2004).

19

### III. **Trial Testimony**

20
21
22

The State argued at trial that Gallegos and Antonio Barajas entered Gordon Stine's motel room because Gallegos was looking for drugs. There was a fight, and Gallegos stabbed Stine in the neck.

23
24
25
26
27
28

Roger Fletcher testified that he was staying in the room across from Gordon Stine at the time in question. Exh. 19, pt. 1, pp. 158-172.  He stated that he was in his room at about 2 or 3pm when he heard noises that sounded like the door to Stine's room was being forced open or like someone was rushing into the room.  He heard Stine screaming at the top of his lungs: "I have no dope, man. I have no dope." He heard the voice say something like "Ow." Then he heard wrestling noises, then silence. Fletcher

4

peeked out of his window when he heard the door to Stine's room open and he saw two men, possibly Hispanic, from the back as they left the room and ran down the stairs. On cross-examination Fletcher acknowledged that he had never spoken with Stine, and he did not know for sure that it was Stine's voice he heard yelling.

Investigator Candis Potts testified. Exh. 19, pt. 1, pp. exh. 19, pt. 2, pp. 55-87. She took photos of abrasions on Gallegos' forehead and right hand. Photos she took of Antonio Barajas showed no signs that he had been in a physical altercation. Potts acknowledged on cross that if Barajas had stabbed Stine without warning that that could have resulted in Barajas having no physical signs of having been in a fist fight. She also testified that there was no evidence that the motel room door or lock had been broken.

Charles Hobbs testified that on the afternoon in question Gallegos and Barajas showed up at his residence and asked Hobbs to get rid of a knife. Exh. 19, pt. 2, pp. 87-120.  Hobbs took the knife and placed it in his sink. Gallegos said to Barajas "I shouldn't have gone back, it's a mess." Gallegos asked Hobbs if there was any blood on Gallegos' sweatshirt. Hobbs told him yes, so he took off the sweatshirt and washed his hands.  Gallegos was on his cell phone, but it wasn't working so he got another phone from Barajas. Hobbs said he sprayed some bleach on the knife then dropped it in a vent right outside his residence. He put the clothing that Gallegos and Barajas had removed into a bag and put the bag in his room.  The next day detectives questioned him, and he gave them the clothing and told them where he had put the knife.

Taunya Owens testified. Exh. 19, pt. 2, pp. 121-139. She said that Gallegos wanted to know if she knew anyone who would be interested in buying a motored scooter from him because he had stabbed someone in the neck and needed to get out of town. On cross examination Owens said that in her experience Gallegos would exaggerate and brag about things he didn't do, and she didn't really think he had stabbed anyone.

John Herbaugh testified that he had been good friends with Stine for several years. Exh. 19, pt. 2, pp. 140-175. Exh. 21, pp. 6-26.  Herbaugh stated that two days before

the murder he purchased a cell phone from Gallegos' girlfriend, who wanted the money to buy drugs. After the girlfriend had left, Gallegos was knocking at Herbaugh's door. He didn't answer. The next day he was talking to Stine on the phone and told Stine that he didn't trust Gallegos and his girlfriend, and he didn't think Stine should trust them either. The day after that, on the night in question, around 7pm Herbaugh saw that he had missed a call from Stine. He returned the call, and Gallegos answered. Herbaugh did not speak to him but listened to a voicemail from Gallegos; he said "I worked over Gordon. So you want to come out and play?"  On cross examination Herbaugh agreed that he could not exactly decipher what Gallegos said on the message; he thought he might also have said something like "I partnered with Gordon."  Herbaugh acknowledged that after he told Stine to stay away from Gallegos, Stine said: "Let's go after him."

Christi Weiss testified that she was Herbaugh's girlfriend. Exh. 21, pp. 27-39.  Weiss said that on the night in question she walked in to hear the end of a conversation Herbaugh was having on his cell phone. After he hung up, he told Weiss, "That was G [Gallegos]. I don't know why G has got Gordon's phone." She stated that she never saw or heard of Stine selling drugs. On cross-examination she acknowledged that Stine used drugs sometimes and would come to her for marijuana and methamphetamine.

Antonio Barajas testified. Exh. 21, pp. 40-201. He said that on the day in question, he and Gallegos were walking around downtown Reno. They ended up at the Knights Inn, where Stine was staying. Barajas was following Gallegos up the stairs to the second or third floor. Gallegos went to a motel room; Barajas did not know if the door had been opened or closed because he stopped to tie his shoes. He just heard Gallegos and another man arguing.  Barajas went into the motel room and closed the door.  Gallegos and the man argued heatedly, and then grabbed each other and began physically fighting. They were punching each other, fell to the ground and continued to wrestle and punch each other. Then the other man turned toward Barajas and came at

him, swinging. Barajas punched him several times in the face. At some point, Stine fell back on the bed and said "I'm cool. I'm done. I don't want to fight anymore." Stine had blood on his nose and mouth. Gallegos ran out of the room, and Barajas followed. Barajas followed Gallegos to a house; Barajas did not know the house or the man who was there. Barajas took off his sweatshirt because it had blood on it. He wasn't paying attention to what Gallegos was doing or saying. Barajas' tennis shoes had blood on them. He took them off and threw them away; the man at the house gave him some slippers and he started walking back to his girlfriend's motel room. A white van pulled up with 4 men and Gallegos. Barajas got in and they dropped him at the motel. Barajas went to the motel room. His girlfriend and Gallegos' girlfriend were there. He told Gallegos' girlfriend that she had to leave. Barajas said that he did not have a knife with him that day. He testified that he did not see Gallegos stab Stine, and he did not see a knife in Gallegos' hand. Barajas testified that he did not stab Stine.

On cross examination Barajas testified that he sometimes carries a knife that his girlfriend gave him. He reiterated that he did not stab Stine. On redirect Barajas stated that he did not have that knife in his possession during the incident.

Barajas' girlfriend Geez Taylor testified. Exh. 21, pp. 202-222, 234-237; exh. 23, pp. 7-25. She echoed that she and Barajas were hanging out in their motel room on the day in question when Gallegos and his girlfriend came by.  Barajas left with Gallegos. Barajas returned about an hour later; he no longer had his sweatshirt or shoes and he appeared shaken and nervous. To her knowledge, Barajas had not been carrying a knife. Taylor asked Barajas repeatedly what had happened, but he did not respond. Taylor said that Barajas finally said several times "G fucked up." Exh. 21, p. 222.

Reno police detective John Ferguson testified that after executing a search warrant at Gallegos' residence, Gallegos voluntarily accompanied the officer to the police station for an interview. Exh. 23, pp. 104-170, 173-211. The officer stated that he asked Gallegos if he had ever been over to the motel where Stine was staying. Stine was

7

killed on a Monday, and Gallegos changed his story multiple times regarding where and with whom he'd been on Saturday, Sunday, and Monday. *See, e.g., id*. at 165-169. Gallegos maintained that he'd never been at the motel where Stine was staying. He kept telling the officer that he did not use Stine's cell phone the day he was killed. Then he said, "I used the phone one time, but I didn't threaten nobody or nothing like that." The detective noted that he had never mentioned anything about a threat. *Id*. at 167. First, Gallegos said his girlfriend Tanya Burgess gave him the phone, then he said that Barajas gave him the phone. The detective played the message to Gallegos. The detective understood the message to say: "Hey mother fucker. This is G right here. But me and Gordo (inaudible) still want to play, we'll play (inaudible)." Gallegos acknowledged that he was known as "G," but denied that it was him speaking on the message. Then he admitted to leaving the message, but said he left it for John Herbaugh, his girlfriend's friend. He felt that Herbaugh was being disrespectful to his girlfriend. The detective told him that Taunya Owens told police that Gallegos bragged that he had stabbed someone in the neck.  Gallegos denied it and terminated the interview shortly after. The detective said ok and left the room. Gallegos was still being videotaped and said to himself "I'm gonna kill myself." *Id*. at 163. Gallegos began to hyperventilate and complained of chest pains. He was ultimately transported to the hospital.

Tanya Burgess testified that Gallegos was her boyfriend during the time in question. Exh. 23, pp. 211-276; exh. 27, pp. 12-80. The day Stine was killed Burgess and Gallegos went to the motel where Barajas and his girlfriend Taylor were staying. Barajas and Gallegos left at some point for about an hour saying they had to take care of some business. When they returned, Burgess said that Gallegos was in a very different, strange mood; she knew something had happened. Gallegos was using a phone with a dragon on it that she'd never seen before.  Gallegos no longer had the sweatshirt on that he had left in. She said that later in the day Gallegos told her that he

and Barajas were fighting Stine and that Gallegos took the knife and put it through Gordon's throat. Gallegos said it was Stine's jugular vein, and dark blood started coming out of his mouth. Burgess identified the knife at trial as belonging to Gallegos and said he sleeps with the knife every night. Burgess testified that Gallegos tried to call her friend John Herbaugh on Stine's cell phone.  Burgess knew it was Stine's because she had gone to Stine's room on a different day and used it to make a couple of calls. Burgess also said that when she first talked to detectives, she told them that when Gallegos told her he had stabbed Gordon Stine, she didn't believe him because "G is all talk." Exh. 23, p. 264.

Burgess testified that later that evening Gallegos continued to talk about killing Stine; Gallegos told her they'd gone to Hobbs' house and left his sweatshirt and hid the knife in the heater vent there.

IV.   **Instant Petition**

**Ground 1**

Gallegos asserts that the jury instructions were misleading and failed to give effect to all elements necessary for conviction in violation of his Fifth and Fourteenth Amendment rights to due process and a fair trial (ECF No. 42, pp. 15-21).

To obtain relief based on an error in instructing the jury, a habeas petitioner must show the "'instruction by itself so infected the entire trial that the resulting conviction violates due process.'"  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  Where the defect is the failure to give an instruction, the inquiry is the same, but the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law.  *See Henderson v. Kibbe*, 431 U.S. 145, 155-157 (1977); *see also Estelle*, 502 U.S. at 72. The federal constitution requires the State to prove every element of the charged offense. *See Sandstrom v. Montana*, 442 U.S. 510, 521 (1979) (holding that a

defendant is deprived of due process if a jury instruction has, or jury instructions have, "the effect of relieving the State of the burden of proof enunciated. . . on the critical question of the petitioner's state of mind"); *accord Francis v. Franklin*, 471 U.S. 307, 326 (1985) (reaffirming "the rule of *Sandstrom* and the wellspring due process principles from which it was drawn"); *see also In re Winship*, 9 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged").

The State pursued two theories of first-degree murder—willful premeditation and deliberation and felony murder. Exh. 24, Jury Instruction nos. 22-32.

> Jury Instruction No. 22:
>
> The elements of the crime of Murder with a Deadly Weapon are:
>
> 1. On January 21, 2008;
> 2. in Washoe County, Nevada;
> 3. the defendant did willfully and unlawfully;
> 4. kill Gordon Stine, a human being;
> 5. with malice aforethought, either express or implied;
> 6. or during the perpetration of a burglary;
> 7. with a deadly weapon.
>
> Jury Instruction No. 23:
>
> Murder is divided into two degrees.
>
> Murder of the first degree is murder which is willful, deliberate and premeditated.
>
> Murder of the second degree is all other kinds of murder.

Instruction No. 24 described murder in the first degree as:

> murder which is perpetrated by means of any kind of willful, deliberate, and premeditated killing. All three elements—willfulness, deliberation, and premeditation—must be proven beyond a reasonable doubt before an accused can be convicted of first-degree murder.
>
> Jury Instruction No. 27 states:

The Amended Information alleges two alternative theories of Murder, as allowed by law. The second paragraph of the Amended Information alleges the defendant committed the murder pursuant to the so-called "felony murder" rule. The elements of felony murder are:

1) The defendant did willfully and unlawfully;
2) kill a person;
3) during the perpetration of a burglary.

In regard to the felony murder alternative, the State is not required to prove that the killing was committed with malice, premeditation, or deliberation. The State is only required to prove the elements set forth above.

Jury Instruction No. 28 lists the five elements of burglary:

1. The defendant, individually or in joint participation with others;
2. by day or night;
3. did enter any room, apartment or tenement;
4. with the intent to commit larceny, assault or battery on any person;
5. in Washoe County, Nevada.

Gallegos argues that the definition of first-degree murder and the listing of the elements necessary to prove the crime is unclear.

Gallegos did not object to the instructions; therefore, the Nevada Supreme Court reviewed them on appeal for plain error. Exh. 4, pp. 8-9. The court rejected Gallegos' challenges to the first-degree murder instructions:

Jury instruction no. 22 informed the jury on the elements of murder. It stated that the jury could find Gallegos guilty of murder if he willfully and unlawfully killed Stine with malice aforethought, either express or implied, or during the perpetration of a burglary with a deadly weapon. Jury instruction no. 23 further instructed the jury that first-degree murder is "murder which is willful, deliberate and premeditated." Jury instruction nos. 24 through 26 specifically defined willfulness, deliberation, premeditation, malice aforethought, express malice, and implied malice. Therefore, the jury instructions distinctively defined the difference between first-degree murder and second-degree murder. The jury instructions specifically stated that first-degree murder required the elements of deliberation and premeditation. Further, jury instruction no. 24, which defined first-degree murder, was an exact duplicate of the instruction we instructed district courts to use in cases where defendants are charged with first-degree murder based on willful, deliberate, and premeditated killing. *Byford v. State*, 116 Nev. 215, 236-37, 994 P.2d 700, 714-15 (2000). Accordingly, the jury instructions concerning first-degree murder were correct

statements of the law and, therefore, we determine that the district court did not commit plain error in providing the jury with jury instruction nos. 22 through 26.

*Id*. at 9.

The first-degree murder instructions were duplicates of long-approved Nevada jury instructions and correct statements of the law. Gallegos has failed to demonstrate that the Nevada Supreme Court's decision on federal ground 1 was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d). Ground 1, therefore, is denied.

**Ground 4(a)**

Gallegos argues that his trial counsel was ineffective for failing to object to prosecutorial misconduct during closing argument in violation of his Sixth Amendment right to effective assistance of counsel (ECF No. 42, pp. 30-33). Ineffective assistance of counsel (IAC) claims are governed by the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court held that a petitioner claiming ineffective assistance of counsel has the burden of demonstrating that (1) the attorney made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment, and (2) that the deficient performance prejudiced the defense. *Williams*, 529 U.S. at 390-91 (citing *Strickland*, 466 U.S. at 687). To establish ineffectiveness, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *Id*. To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. A reasonable probability is "probability sufficient to undermine confidence in the outcome." *Id*. Additionally, any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct, in order to avoid the distorting effects of hindsight. *Strickland*, 466 U.S. at 689. It is the

petitioner's burden to overcome the presumption that counsel's actions might be considered sound trial strategy. *Id*.

Ineffective assistance of counsel under *Strickland* requires a showing of deficient performance of counsel resulting in prejudice, "with performance being measured against an objective standard of reasonableness, . . . under prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotations and citations omitted). When the ineffective assistance of counsel claim is based on a challenge to a guilty plea, the *Strickland* prejudice prong requires a petitioner to demonstrate "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

If the state court has already rejected an ineffective assistance claim, a federal habeas court may only grant relief if that decision was contrary to, or an unreasonable application of, the *Strickland* standard. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id*.

The United States Supreme Court has described federal review of a state supreme court's decision on a claim of ineffective assistance of counsel as "doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1413 (2009)). The Supreme Court emphasized that: "We take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d).'" *Id*. at 1403 (internal citations omitted). Moreover, federal habeas review of an ineffective assistance of counsel claim is limited to the record before the state court that adjudicated the claim on the merits. *Cullen*, 563 U.S. at 181-84. The United States Supreme Court has specifically reaffirmed the extensive deference owed to a state court's decision regarding claims of ineffective assistance of counsel:

> Establishing that a state court's application of *Strickland* was
> unreasonable under § 2254(d) is all the more difficult. The standards

created by *Strickland* and § 2254(d) are both "highly deferential," *id*. at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S. at ----, 129 S.Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at ----, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 105. "A court considering a claim of ineffective assistance of counsel must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id*. at 104 (quoting *Strickland*, 466 U.S. at 689). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id*. (internal quotations and citations omitted).

Here, Gallegos asserts that the prosecution made numerous false statements in closing arguments and that his counsel failed to object. He alleges the following:

The prosecutor misstated the trial evidence by arguing that the final five words of Gordon Stine were: "I ain't got no dope. I don't have any dope. And then he heard 'Ow.' And then he heard silence." *See* exh. 27, p. 186. The witness who testified to hearing these utterances was staying in the motel room across from Stine and had never met or had a conversation with Stine. *See* exh. 19, p. 167. The witness stated that he could not be sure it was Stine speaking.

The prosecutor represented this same witness' testimony as describing the two men who left the room as Hispanic-looking males, but the witness testified that the males may have been Hispanic; he was not sure. *See* exh. 27, p. 186; exh. 19, pp. 163, 169.

The prosecutor maintained that Charles Hobbs testified that both Gallegos and Barajas washed their hands and used bleach to clean the knife allegedly used in the stabbing. *See* exh. 27, p. 187. But Hobbs' testimony was that he placed the knife in his sink. *See* exh. 19, pt. 2, pp. 94, 96, 97, 99.  After placing the knife in the sink, Hobbs

washed his hands and cleaned the knife with bleach. Gallegos and Barajas washed their hands approximately five minutes after Hobbs washed his hands. Hobbs saw neither Barajas nor Gallegos use bleach on their hands.

The prosecution suggested Gallegos' pants were covered in blood when there was only a small spot of blood on them. *See* exh. 27, p. 202 ("They're bloody denim pants, and they have Gordon Stine on them because every drop of blood is Gordon Stine, what's left of him."); *accord id*. at 209-210 ("[Gallegos] was wearing part of Gordon Stine's life on his pants").

The prosecution argued in closing that Gallegos bragged to Taunya Owens about stabbing Gordon Stine ("Stine") in the neck, inferring that he was bragging about allegedly murdering Stine: "Taunya Owens testifies that the defendant tried to sell her that scooter." Exh. 27, p. 189. "He said 'I have to do this because I stabbed someone in the neck and the law will be looking for me.'" *Id*. The prosecutor stated that defense counsel "asked her, 'Did you think he was bragging?' She said, 'I didn't know. He brags a lot. He was calm when he said this.'" The prosecutor argued: "But we saw the evidence in this case. You all saw it. And it wasn't a brag, it wasn't a boast. It was the truth. And that's nothing to brag about." *Id*.

Finally, Gallegos argues that trial counsel failed to object to the prosecutor's use of Gallegos' gang moniker "G" (short for Gangster) in his closing argument. *See, e.g*., exh. 27, p. 208 (That's G's World . . . He's a stand-up guy, that G.").

During the closing arguments for the defense, counsel stressed the uncertainty and inconsistencies of witness testimony and identification and clarified that only a small spot of blood was found on Gallegos' jeans. Exh. 27, p. 222-264.

Affirming the denial of Gallegos' state postconviction habeas corpus petition, the Nevada Supreme Court adopted the state district court's findings regarding this claim:

> (1) The prosecutor corrected his statement that a witness "said he heard what he thought to be a door being kicked in" by further remarking that "it was not a quiet entry." (2) The prosecutor merely

15

asked the jury to conclude that his interpretation of the evidence was reasonable when he stated "I submit to you [that the witness heard] some of the final words of [the victim]. "I ain't got no dope. I don't have any dope." And he heard "ow." (3) Trial counsel responded to the prosecutor's statement about a witness' description of the males as being Hispanic by exploiting the uncertainty of the witness and the nature of the identification during his closing argument. (4) The prosecutor's characterization of statements that Gallegos made to a witness as the truth, rather than boasts, was permissible and there was no objection that trial counsel could make. (5) The prosecutor's statement that Gallegos and Barajas "washed their hands and used bleach to take [the victim's] blood off the knife: reflected the prosecutor's theory that the two worked in concert and did not prejudice Gallegos. (6) Trial counsel responded to the prosecutor's statement that "They're bloody denim pants and they have [the victim's] blood on them' by stressing that it was single drop of blood the size of a dime during his closing argument. And (7) Gallegos failed to show that he was prejudiced or that trial counsel's performance fell below a reasonable standard.

Exh. 8, p. 4. The Nevada Supreme Court concluded that substantial evidence supported the state district court's factual findings, that the findings were not clearly wrong, and that Gallegos failed to demonstrate that the district court erred as a matter of law. *Id*. Gallegos has failed to demonstrate that the Nevada Supreme Court's decision on federal ground 4(a) was contrary to or involved an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).  The court denies federal habeas relief on ground 4(a).

**Ground 2**

Gallegos contends that the accumulation of errors and abuses of discretion during his sentencing proceeding before the jury violated his Eighth Amendment right to be free from cruel and unusual punishment and his Fourteenth Amendment due process rights (ECF No. 42, pp. 21-28).

The Due Process Clause of the United States Constitution forbids a sentencing authority from acting vindictively. *Cf North Carolina v. Pearce*, 395 U.S. 711, 725 12

(1969), overruled on other grounds by *Alabama v. Smith*, 490 U.S. 794, 799 (1989) (explaining the Due Process Clause prohibits infliction of harsher punishment for exercising constitutional right).

In December 2008, the state district court held a penalty-phase hearing in front of the jury who convicted Gallegos. Exh. 32. At the outset of the hearing, outside the presence of the jury, defense counsel objected that the State planned to introduce prior criminal acts of Gallegos that dated back further than 10 years. Counsel argued that charges or convictions from that long ago were not relevant. The State acknowledged that they intended to have a detective from the Reno Police Department (RPD) Repeat Offender Program (ROP) testify about police records dating back to 1982 involving violent crimes by Gallegos.  They argued that they wanted to demonstrate that each time Gallegos has been released from prison he engaged in violent criminal activity almost immediately. The court ruled that the criminal history was relevant: "If you're talking about knives in the past, if you're talking about nail stabbing in the past, violence, that type of thing, I'm going to let it in." *Id*. at 8.

ROP detective Reed Thomas testified that a person must have 4 felony convictions to be considered for ROP monitoring. *Id*. at 14-40.  He said that Gallegos had been a ROP target since 2005 and has 5 prior felony convictions. The court overruled a defense objection that Thomas should not be allowed to testify about a 1992 conviction with which he was familiar only because he read the police report. Thomas then described the incident: officers responded to a domestic dispute; Gallegos' girlfriend did not want to talk to the police, but her mouth was bleeding, so officers took Gallegos into custody. After Gallegos was removed from the scene, his girlfriend told police that several days earlier Gallegos had stabbed her several times in the leg with an ice pick. She showed officers injuries consistent with such a stabbing. Another person on the scene had a puncture wound to his chest and two puncture wounds to his abdomen. He told police that Gallegos and his girlfriend were arguing, the person attempted to

intervene when Gallegos began punching his girlfriend in the mouth, and Gallegos picked up a nail off the floor and stabbed the person in the upper chest and lower abdomen. Gallegos was arrested; he ultimately was convicted for stabbing the third person, but the charges involving his girlfriend were dismissed.

Thomas testified that Gallegos had four other felony convictions: a 1982 burglary; 1983 battery with a deadly weapon; 1983 possession of stolen motor vehicle; and 1998 grand larceny. He also testified that Gallegos had three gross misdemeanor convictions: 1981 conspiracy to commit grand larceny; 2005 battery upon a police officer; and 2006 attempted possession of a stolen motor vehicle. For the two most recent gross misdemeanors, Gallegos was sentenced to the maximum sentence of 12 months in jail.

Thomas estimated that out of 700 ROP targets, he would put Gallegos in the top 10% of the most violent.

Retired RPD detective Judy Holladay also testified that in 2005 she went to talk to Gallegos as he was a crime suspect. *Id*. at 41-46. They spoke briefly and then she told him he was under arrest. When she placed her hand on his arm to put him in handcuffs, he started struggling with her and then punched her in the throat.

Barbara LePage, the victim's sister, testified. *Id*. at 47-57. In response to the prosecutor's question, she stated that she believed a sentence of life without parole was appropriate—that it was a just punishment and that it would get a violent criminal off the streets. Another sister, Shari Vullo, also testified that she felt that Gallegos should never be able to hold his family again. *Id*. at 62. The third sister Lori Stine read a statement she had prepared. *Id*. at 65-70.

The Nevada Supreme Court considered whether it was an abuse of discretion to admit Gallegos' criminal history and to allow certain victim impact testimony:

The sentencing hearing

Gallegos contends that the district court abused its discretion and violated his due process rights when it admitted his criminal history and allowed victim impact testimony during the sentencing hearing before the jury. We

18

address Gallegos's criminal history and then turn to the victim impact testimony.

Standard of review

The district court's decision to admit particular evidence during the penalty phase is within the sound discretion of the district court and "will not be disturbed absent an abuse of [that] discretion." *Wesley v. State*, 112 Nev. 503, 519, 916 P.2d 793, 804 (1996).

Gallegos' criminal history

Gallegos asserts that the district court abused its discretion in admitting evidence of Gallegos' prior felony and gross misdemeanor convictions because they were unduly prejudicial.

Where a defendant is found guilty of first-degree murder, the district court must conduct a separate penalty hearing. NRS 175.552(1). "During the hearing, evidence may be presented concerning. . . any other matter which the court deems relevant to the sentence, whether or not the evidence is ordinarily admissible." NRS 175.552(3). Evidence of the defendant's character and specific instances of conduct is admissible in the penalty phase, but the evidence must be relevant and the danger of unfair prejudice must not substantially outweigh its probative value. *Pellegrini v. State*, 104 Nev. 625, 630-31, 764 P.2d 484, 488 (1988).

Consequently, "[o]ther criminal conduct may properly be considered at the sentencing hearing, even though the defendant was never charged or convicted of it." *Sheriff v. Morfin*, 107 Nev. 557, 560, 816 P.2d 453, 455 (1991). Consideration of a defendant's uncharged crimes and prior criminal history "is solely for the purpose of gaining a fuller assessment of the defendant's 'life, health, habits, conduct, and mental and moral propensities." *Denson v. State*, 112 Nev. 489, 494, 915 P.2d 284, 287 (1996) (quoting *Williams v. New York*, 337 U.S. 241, 245 (1949)).

During the penalty phase, the State introduced certified judgments of conviction for Gallegos' five prior felony convictions and three prior gross misdemeanor convictions. The State elicited testimony from Detective Reed Thomas concerning the facts surrounding Gallegos' 1992 conviction for battery with a deadly weapon. Detective Thomas also testified that Gallegos was a target of the Repeat Offender Program and one of the worst offenders in the program. Finally, the State presented Officer Judy Holladay's testimony regarding the facts surrounding Gallegos' 2005 conviction for battery on a police officer.

We determine that the evidence presented during the penalty hearing was relevant, had a high probative value in showing Gallegos' propensity to commit crime and acts of violence, and was not unduly prejudicial. It

demonstrated that Gallegos had a lengthy criminal history that began in 1981 and that, despite numerous convictions and incarcerations, he has not been rehabilitated or deterred from criminal behavior. Further, Detective Thomas' and Officer Holladay's testimony concerning Gallegos' battery convictions showed that, over time, Gallegos has become more violent and dangerous to society. Therefore, Gallegos' overall criminal history and propensity for violence was relevant to the sentence and had a high probative value in gaining a full assessment of Gallegos' 'life, health, habits, conduct, and mental and moral propensities." *Id*. (quoting *Williams v. New York*, 337 U.S. 241, 245 (1949)).

Accordingly, we conclude that the district court did not abuse its discretion in admitting Detective Thomas' and Officer Holladay's testimony and evidence of Gallegos' prior felony and gross misdemeanor convictions.

Victim impact testimony

Gallegos contends that the district court abused its discretion when it allowed Stine's sisters to "recommend" a sentence to the jury. Specifically, he argues that a victim may not express an opinion regarding a defendant's sentence during a noncapital sentencing hearing before a jury.

In Nevada, "before imposing sentence, the court shall afford the victim an opportunity to. . . [r]easonably express any views concerning the crime, the person responsible, the impact of the crime on the victim and the need for restitution." NRS 176.015(3)(b).

In *Randell v. State*, 109 Nev. 5, 846 P.2d 278 (1993), we had the opportunity to address the breadth of NRS 176.015 and the proper use of victim impact testimony in noncapital cases. In *Randell*, the defendant was convicted of first-degree murder. 109 Nev. at 6, 846 P.2d at 279. During the sentencing hearing, the district court permitted a victim to express his views as to the amount of prison time he felt the defendant should receive. *Id*. The district court ultimately sentenced the defendant to a life term without the possibility of parole. *Id*.

On appeal, the issue presented was whether the district court erred when it allowed the victim to recommend a sentence for the defendant. *Id*. We concluded that it was not. *Id*. at 7, 846 P.2d at 280. In reaching our holding, we distinguished United States Supreme Court precedent concerning the use of victim impact evidence on two grounds; namely, that the United States Supreme Court's holdings were (1) expressly limited to capital cases, and (2) involved jury sentencing determinations. *Id*. at 7-8, 846 P.2d at 280. As part of the basis of our reasoning, we recognized that a "district court is capable of listening to the victim's feelings without being subjected to an overwhelming influence by the victim in making its sentencing decision." *Randell*, 109 Nev. at 8, 846 P.2d at 280.

Accordingly, we held that NRS 176.015 was deemed broad enough to encompass the victim's views about sentencing and that "[a] victim may express an opinion regarding the defendant's sentence in a noncapital case." *Id*. at 8, 846 P.2d at 280.

During the penalty hearing, the court allowed Stine's sisters to "recommend" to the jury that Gallegos be sentenced to life in prison without the possibility of parole. Although the sentencing body in *Randell* was a judge and not a jury, as is the case here, we have repeatedly reaffirmed *Randell* and conclude that its general holding applies here. *E.g., Gallego v. State*, 117 Nev. 348, 370, 23 P.3d 227, 242 (2001) ("A victim can express an opinion regarding the defendant's sentence only in noncapital cases."). Moreover, NRS 176.015 is broad and does not differentiate between sentencing bodies, i.e. judges and juries; rather, it plainly permits the victim to "[r]easonably express any views concerning. . . the person responsible." NRS 176.015(3)(b). Because *Randell* holds that a victim may express an opinion regarding the defendant's sentence in a noncapital case, and NRS 176.015 does not differentiate between sentencing bodies, we determine that the district court did not abuse its discretion when it allowed Stine's sisters to express an opinion regarding Gallegos' sentence.

Exh. 4, pp. 13-17.

The criminal history and victim impact testimony introduced was all well within the parameters of Nevada law. Thus, the court concludes that Garcia has failed to demonstrate that the Nevada Supreme Court's decision on federal ground 2 was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).  Federal habeas relief is denied as to ground 2.

The petition, therefore, is denied in its entirety.

V.    **Certificate of Appealability**

This is a final order adverse to the petitioner.  As such, Rule 11 of the Rules Governing Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA).  Accordingly, the court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA.  *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right."  With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct.  *Id*.

Having reviewed its determinations and rulings in adjudicating Gallegos' petition, the court finds that reasonable jurists would not find its determination of any grounds to be debatable pursuant to S*lack*.  The court therefore declines to issue a certificate of appealability.

VI.    **Conclusion**

**IT IS THEREFORE ORDERED** that the amended petition (ECF No. 42) is **DENIED** in its entirety.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk shall enter judgment accordingly and close this case.


DATED: 7 day of September 2021.


_____
ROBERT C. JONES
UNITED STATES DISTRICT JUDGE